[Civ. No. 9284. Third Dist. Jan. 31, 1958.]

Estate of NINIAN C. RILEY, Deceased. HAZEL P. RILEY, Appellant, v. EMILY P. RILEY, Respondent.

Norris M. Goodwin, Eugene W. Bell and Stephens, Jones, LaFever & Smith for Appellant.

Jack M. McPherson for Respondent.

VAN DYKE, P. J.—Hazel P. Riley, hereinafter called Hazel, and Ninian C. Riley, deceased, hereinafter called Ninian, were married on June 1, 1950. He died July 20, 1954. He left a will executed prior to his marriage. Emily P. Riley, his sister, hereinafter called Emily, was the sole beneficiary. The will is in probate and Emily is the executrix. Hazel commenced proceedings in the estate to assert her right to the community property and to one-half of the separate property. On June 16, 1954, Ninian and Hazel entered into a property settlement agreement. After his death Hazel began a proceeding to have the agreement voided for fraud. In this she was successful. She also began a suit against Emily to have it declared that certain property which was community had been given to Emily by Ninian during the marriage and Hazel sought to have it declared that she was entitled to one-half of that property as having been a gift made without her consent. The action to annul the property settlement agreement was first tried and decided in Hazel's favor. Thereafter, the estate proceeding and the action to recapture one-half of the value of the gift were consolidated for trial so

far as the taking of evidence was concerned. The court held that Ninian's gift to Emily had been a gift of his separate property in which the community had no interest and that all the property in the estate had also been the separate property of Ninian; that Hazel had no community rights therein and was entitled to take only her share of the separate property, her right to share depending on the fact that the will giving it all to Emily had been executed prior to the marriage. From the order in probate and from the judgment entered against her, Hazel appeals.

Throughout the marriage Hazel had been employed, receiving take-home pay of approximately $200 per month. At the time of the marriage Ninian was a totally disabled war veteran receiving a government pension of $150 per month. During the marriage his pension check ranged from $150 per month to a maximum of $193.50 per month. He was never gainfully employed during the marriage. At the time of the marriage his total net worth was in excess of $20,000, and it consisted of a commercial checking account in the Bank of America, a savings account in that bank, two promissory notes secured by deeds of trust, a promissory note of his brother Otis and a Chrysler automobile. When he died he possessed cash in bank, cashier's checks, real property, an automobile and United States Savings Bonds aggregating in value a little over $23,000. This total includes the gift to Emily. There was evidence that his net worth had been increased during the marriage by the sum of $2,772.16. Hazel testified that during the marriage she had generally turned her salary over to Ninian. It appears that no separate account was kept of her contributions to the community but it is the only fair inference that her contributions totaled approximately the amount of her earnings during the marriage. Ninian invested and reinvested funds during the marriage, buying, improving, and selling several parcels of real property, generally taking title in his own name. He collected funds from the secured note obligations he held when married. Hazel relies heavily on the presumptions that properties coming into the community, even though in the name of Ninian, were community. One parcel of real property was acquired in joint tenancy, but shortly thereafter Hazel executed a quitclaim of her interest in this parcel to Ninian. She claims this deed should have been declared void for fraud and that this property, which was later sold and the proceeds reinvested in the name of Ninian, should be treated as com-

munity property. She further claims that property into which it can be traced was likewise community, and finally that Ninian's dealings with his separate property and with the community property, including Hazel's salary, were such as to require the application of the rule on commingling; that therefore all of the property of which he died possessed should be declared to have been community property of the parties and to be therefore distributable to her.

About one month after their marriage, Ninian and Hazel purchased a home for $7,500, taking the title as joint tenants. It is conceded that all of the down payment was paid from Ninian's separate funds. Nevertheless, the presumption arises that Ninian made a gift to Hazel of a one-half interest in the equity. (26 Cal.Jur.2d 105.) The presumption is rebuttable and the sufficiency of evidence to rebut the presumption is generally a matter for the trial court. (*Estate of Trelut*, 26 Cal.App.2d 717, 723 [80 P.2d 147].) Some improvements were made on the property, consisting mostly of interior decorating and carpeting. Hazel testified she paid for some of these. On December 1, 1950, Ninian, from his separate property again, paid on the property the additional sum of $780 and paid the taxes. On November 27, 1950, four months after the initial purchase, Hazel quitclaimed the property to Ninian. There was evidence that thereafter Ninian paid the further installment payments from his private funds and sold the property June 5, 1951. He then paid to Hazel, from the proceeds, funds which could be inferred at least to have been repayment to her of her investments in the way of improvements to the property. From the foregoing the trial court was justified in holding that the presumption of gift arising through the taking of the title in joint tenancy had been rebutted and that whatever community interest might have been acquired by Hazel's small investment in improvements had been relinquished by her to Ninian through her quitclaim deed, for which act she received consideration in that she shared in the proceeds of the sale. Hazel attacks the quitclaim deed as having been fraudulently procured. She testified that her husband told her it was a mere matter of convenience so that he could deal with the property and convey it away without her being required to take time off from her work in order to go to the title company and execute the instruments of conveyance and sale. However, the trial court was not required to believe this as against the inferences to be drawn from the evidence re-

lated above. The presumption of fraud in the obtaining of the quitclaim deed is a rebuttable presumption and we hold the trial court justified in declaring that the proceeds of the sale of the property were the separate property of Ninian.

On November 19, 1951, Ninian purchased in his name a second parcel of real property for $11,565.48. The property was subject to a veteran's contract for $6,046.37, payable in monthly installments of $38 per month. Ninian paid for the equity out of his own bank accounts. By installment payments from the same source he reduced the loan to $5,523.60 by November 5, 1953. He sold the property December 21, 1953, and in the meantime had expended from what were admittedly his own funds certain moneys in improvement of the property. He sold it for $13,500 and, taking into consideration his interest payments, his cash payments and the value of improvements made, it could be inferred that he made no profit on the deal. On June 28, 1954, Ninian purchased a third parcel of real property for $1,444.35, paying for it by cashier's check and from the proceeds of United States Savings Bonds owned by him which he sold. He at once started to build a house which was not completed when he died. The property was sold in the estate for $4,500. The evidence shows he made $162.72 profit on that deal.

When he married Hazel, Ninian owned a note and deed of trust executed by one Tomita in the principal sum of $13,-000, payable in monthly installments. By March 30, 1953, the principal balance of the note was $7,870.11. On April 21, 1953, he sold the note to Emily for the balance due.

At the time of his marriage, Ninian owned a note and deed of trust executed by Mr. and Mrs. Barsley in the principal sum of $5,000, payable in installments. The balance as of the date of marriage was $1,409.97. This note was paid March 30, 1951, and the payment deposited in Ninian's savings account. When he married Hazel, Ninian was owed $2,000 by his brother Otis, which was repaid to him during the marriage.

On July 27, 1949, prior to his marriage, Ninian purchased an automobile for $2,687. He traded it in on a second car, receiving $2,000 on the trade-in and paying a $1,000 balance by check. This car was wrecked and the property damage insurance of $1,900 was paid to Ninian. With this money he purchased a third car, paying a balance of about $600 by sale of a savings bond and by money from his bank account. The car was owned by him at his death and passed into the

estate, appraised at $1,500. During the approximate four years of marriage, Ninian received pension checks totaling $8,807.30. Hazel cashed the last check for $193.50 and retained the proceeds. All of the other pension checks were cashed by Ninian and there was no record that any portion of them went into his bank account. Inferably, the money was used for the support of himself and his wife.

We have been at pains to reflect herein a fair summary of the detailed accounting which Emily made in these proceedings for her decedent in order to pass upon the contentions of appellant with respect to the character of the property of which Ninian died seized. We think it apparent that the trial court was fully warranted in concluding from all of the evidence that the entire property of which Ninian died seized was his separate property and that there had been no such commingling of community funds with separate funds as to call for the application of the rule on commingling. The rule on commingling is well enough stated in 10 California Jurisprudence 2d 702, wherein it is said:

"Where separate property or funds are intermingled with community property or funds, the respective properties or funds remain unchanged in character so long as they can be clearly ascertained. But the presumption in favor of community property applies to commingled property so that the burden of proof rests upon the party claiming a part às his separate property. Accordingly, if separate property or funds which have been commingled with community property cannot be traced, the entire mass is treated as community property. However, if the community property is inconsiderable in amount as compared with the separate property confused and blended with it, the whole seems to be treated as separate property."

It is apparent from the foregoing that when it is considered that these two people maintained themselves during the period of the marriage, during which time their earnings were meager, and when we consider that during the period of the marriage Ninian's estate increased but little and that the increase can be attributed to increase in value of assets, it is apparent the court could infer that the rule on commingling ought not to be applied and that the court should not declare the separate property of Ninian to be community for any failure of Ninian to properly account. With reasonable certainty the accounting did disclose the true nature of the property and showed further that any community prop-

erty which might have been commingled with his separate property was very small in comparsion to the separate property. The record presented a question of fact for resolution by the trial court upon what, at best, can be termed conflicting evidence. The findings of the trial court cannot be set aside on appeal.

What has been said disposes of the issues involved in the civil proceeding wherein Hazel sought to recover one-half the value of United States Savings Bonds which had been purchased by Ninian and made payable to Emily upon his death. The record discloses that the purchase was made from Ninian's separate funds or from property which the court inferentially held to have been his separate property or the proceeds thereof. Once again a factual issue was presented to the trial court which, upon conflicting evidence preponderating largely against Hazel, the court resolved against her.

In appellant's opening brief it was contended that certain allowances of attorney's fees had been made wherein Emily's counsel had been paid for services rendered to her in her individual capacity and not in her capacity as executrix. However, we understand from the closing brief that these contentions have been withdrawn as having been based upon a misunderstanding of the proper construction of the trial court's findings. It is unnecessary, therefore, to consider them.

The judgment and order appealed from are affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied February 21, 1958, and appellant's petition for a hearing by the Supreme Court was denied March 26, 1958.